# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **MERRILL J. HICKLIN BEFORT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 08-2598-KHV** |
| | ) | |
| **STATE OF KANSAS, DEPARTMENT OF** | ) | |
| **COMMERCE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Merrill J. Hicklin Befort brings suit against the Kansas Department of Commerce and Howard Fricke, Secretary of Commerce, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e et seq. and the Kansas Act Against Discrimination ("KAAD"), K.S.A. §44-1001 et seq. Under 42 U.S.C. § 1983, plaintiff also claims that defendants deprived her of a liberty interest in her good name and reputation in violation of the Fourteenth Amendment. This matter is before the Court on Defendants' Motion For Summary Judgment (Doc. #37) filed August 7, 2009. For reasons stated below, the Court finds that the motion should be sustained in part.

## Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. The inquiry is whether the evidence

1

presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

A "genuine" factual dispute requires more than a mere scintilla of evidence. Id. at 252. The moving party bears the initial burden of showing the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, Okla., 942 F.2d 737, 743 (10th Cir. 1991). Once the moving parties meet their burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which [he] carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). And, while the Court views the record in a light most favorable to the party opposing summary judgment, the nonmoving party may not rest on his pleadings but must set forth specific facts. Id. The nonmoving party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial. Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). If the nonmoving party's evidence is merely colorable or is not significantly probative, summary judgment may be granted. Liberty Lobby, 477 U.S. at 250-51.

## **Facts**

The following facts are uncontroverted or, where controverted, construed in a light most favorable to plaintiff.[1]

---

[1]     Plaintiff has generally complied with D. Kan. Rule 56.1, the local rule which governs summary judgment and requires a party opposing a motion for summary judgment to begin the opposition with a section that contains a concise statement of material facts as to which the party contends a genuine issue exists, separately numbering by paragraph each fact in dispute, referring with particularity to the portions of the record upon which the opposing parties rely, and (if applicable) stating the number of movants' fact that is disputed. D. Kan. Rule 56.1(b). Occasionally, however, plaintiff has improperly attempted to controvert facts with conclusory legal arguments which the Court disregards. Ferluga v. Eickhoff, No. 05-2338-JWL, 2006 WL 3144218

(continued...)

Plaintiff began work at Commerce in 2004 as an Attorney III. She is currently an Attorney IV. She is a classified employee under the Kansas Civil Service Act, K.S.A. § 75-2925 et seq. Since 2004, Robert North, Chief Legal Counsel, has served as head of Commerce's legal division. He supervises plaintiff and the other attorney at Commerce. North has never given plaintiff a negative performance evaluation.[2] During her employment at Commerce, plaintiff's job responsibilities have not changed. Her salary, however, has increased.

In the summer of 2004, John Yeary went to work at Commerce as an Attorney III. In early January of 2005, plaintiff learned that even though they performed the same work, Yeary earned a higher salary than she did. Plaintiff immediately complained to North about the difference in pay.

On March 4, 2005, North gave plaintiff a letter of counseling for failure to maintain a harmonious working relationship with co-workers. On March 10, 2005, plaintiff filed a grievance with Commerce, contending that she received discipline in retaliation for complaining about the disparity in pay between her and Yeary. On April 22, 2005, Commerce Secretary Fricke upheld the counseling letter and denied plaintiff's grievance.

On August 19, 2005, plaintiff filed an administrative charge with the Kansas Commission on Human Rights ("KCHR") alleging gender-based pay discrimination. She also alleged that in issuing the letter of counseling on March 4, 2005, North was retaliating for her complaint about the pay disparity in early January of 2005. On January 10, 2006, Commerce and plaintiff entered a settlement agreement which resolved plaintiff's administrative charge of August 19, 2005. Commerce agreed to

---

[1](...continued)
at *2 (D. Kan. Oct. 31, 2006).

[2]     Though North is plaintiff's supervisor, his evaluations of her do not affect her compensation because she is a classified employee.

3

retroactively increase plaintiff's compensation to that of the other Attorney III position within Commerce, and to remove the counseling letter from plaintiff's file. In exchange, plaintiff dismissed the KCHR complaint and released Commerce from claims arising as a result of that complaint. Pursuant to the settlement agreement, Commerce raised plaintiff's salary to $54,828.80 – the precise salary as the other classified Attorney III position in Commerce.

Classified v. Unclassified Positions

The Civil Service Act, K.S.A. § 75-2925 et seq., provides job protections to classified employees. These protections include the right to grieve adverse employment actions, suspensions, demotions and terminations to the civil service board. By contrast, unclassified employees are at-will employees. The state civil service pay plan establishes salaries for classified employees; the governor's office sets the salaries for unclassified positions. The Kansas Legislature authorizes across-the-board increases in the step salaries for classified employees. These increases do not affect unclassified employees. If a classified position and an unclassified position perform essentially the same duties, the unclassified position justifies a higher salary because the "at-will" nature of unclassified employment increases the potential risk that the employee will be terminated.[3] See Montague Depo. at 98-99; 148.

Generally, an unclassified position requires a higher salary than a classified position.[4] Some salary-related negotiation is typical when recruiting and hiring an individual to an unclassified position. A qualified candidate for an unclassified position may be able to negotiate a higher salary if the

---

[3] The record contains no evidence as to how much higher a salary an unclassified position justifies. See Montague Depo. at 99.

[4] Plaintiff unsuccessfully attempts to controvert this fact by pointing Commerce Human Resources Manager Jeff Montague's testimony that he could not give a percentage or dollar amount by which an unclassified position justifies a higher salary than a classified position. See Montague Depo. at 99.

candidate pool includes few qualified individuals or if only a few candidates apply. The appointing authority need not advertise an unclassified position or follow any particular process in filling a unclassified position.

Creation of an Unclassified Attorney III Position at Commerce

North testified that Yeary left Commerce in the spring of 2006 because he was dissatisfied with his salary. North testified that at the relatively low classified pay rate, the position which Yeary vacated would not attract quality applicants.[5] North therefore recommended that Commerce either create a new unclassified position or convert Yeary's classified position to an unclassified position. Human Resources decided to create a new position rather than convert the classified position. North testified that one of the primary reasons he recommended creating the unclassified position was to obtain additional funding to provide a higher salary for the position.[6] North Depo. at 92-94, 100. North testified that when he recommended creating an unclassified position, he did not consider the fact that Commerce could pay an unclassified Attorney III more than it was then paying plaintiff. Id. at 106-107.

On March 22, 2006, Rae Anne Davis, Commerce Director of Operations, sent a letter to Governor Kathleen Sebelius asking her to create an unclassified Attorney III position at Commerce.[7]

---

[5] North testified that Commerce advertised or posted the classified position which Yearly vacated to see what quality of applicants a classified position would attract. North Depo. at 94-95. The only advertisement which defendants have produced, however, was approved by North on April 4, 2006. This was *after* the Governor approved a new, unclassified Attorney III position. A reasonable jury could therefore find that defendants never advertised or posted the classified Attorney III position.

[6] Defendants assert that North could serve as the appointing authority to create a new unclassified Attorney III position. See Montague Depo at 13. Plaintiff points to Fricke's deposition testimony that North would have had to get Fricke's approval. See Fricke Depo. at 53.

[7] The letter stated in part as follows:

(continued...)

The letter stated that the new position would function as the Deputy Chief Counsel for Commerce, and that it should be unclassified in part because the position would involve making high level policy decisions for the administration.

On March 28, 2006, the Governor's office approved the creation of an unclassified Attorney III position as follows:

---

[7](...continued)

> We are seeking approval to create a new, unclassified Attorney III position. The position will function as the Deputy Chief Counsel for the agency. Because the position has significant input on broad-based policy decisions affecting the agency and has an opportunity to influence and shape those policies at a high level, we believe the interests of the agency are best served by making the position unclassified. Given that level of functioning and the need for executive branch officials to have optimal ability to implement the policies that best reflect their administration, making the position unclassified may allow for better flexibility in that regard.
>
> The other factor is our need to be more flexible and competitive in terms of compensation. The civil service system has many attributes but providing flexibility for meeting current market salary demands is not one of them. Classified compensation has obviously fallen behind the private sector and perhaps more so in certain fields. In order to recruit and keep highly qualified attorneys, this flexibility would be a great tool.
>
> Please note that we currently have a classified Attorney III position functioning as Deputy Chief Counsel and it will be replaced with this position. The current incumbent has resigned providing us with the opportunity to make this change. Pursuant to K.S.A. 75-2935(I), I respectfully request establishment of the following new position:
>
> Name: N/A
> Class Title: Attorney III (Unclassified)
> Salary/Wage: $55,000 - $63,000
> Effective Date: March 20, 2006

See Ex. R to Defendants' Memorandum In Support Of Motion For Summary Judgment (Defendants' Memo) (Doc. #38) at 1.

Attorney III (Deputy Chief Counsel), Unclassified, Regular, Full-time with benefits, Kansas Department of Commerce, effective March 20, 2006, at an annual salary between $55,000.00 and $63,000.00.

See Ex. Q to Defendants' Memo at 2. Twenty-two candidates, including Robert Hiatt, applied for the unclassified Attorney III position.[8] Rae Anne Davis interviewed Hiatt for the job because North and Hiatt were acquainted. After the interview, North called Hiatt and offered him the job with a salary at the low end of the approved range of $55,000 to $63,000.[9] Hiatt negotiated for a higher salary and a window office. On July 2, 2006, Commerce hired Hiatt at an annual salary of $61,000 – which was $6,172 more than plaintiff's annual salary and $14,400.00 more than Hiatt's former salary at the Insurance Department.

Although Hiatt's primary duties at Commerce include providing legal advice on the workforce development programs and managing federal grants, he had no experience with either. Hiatt's current duties as an Attorney III at Commerce are the same as Yeary's former duties. Hiatt does not perform any duties as Deputy Chief Counsel.

Plaintiff's Request For Window Office

Commerce has three attorneys and three attorney offices. Plaintiff's office has no windows. On March 22, 2006, shortly after Yeary announced his resignation, plaintiff asked North to move her to Yeary's vacant window office. North denied plaintiff's request. He testified that he did so because

---

[8]    When he applied at Commerce, Hiatt worked as an unclassified staff attorney for the Kansas Insurance Department with an annual salary of about $46,600.00. North testified that when he entered negotiations with Hiatt, no other acceptable candidates were interested in the unclassified position. Three candidates, however, Herschel Roach, Michael Corrigan and Perry Franklin, had as much legal experience as Hiatt.

[9]    North is the appointing authority for the legal division; he does not need the Commerce Secretary's approval to hire someone to work in the legal division at Commerce.

Hiatt specifically negotiated for the window office as part of his overall compensation package.[10] Hiatt did not apply for the Attorney III position, however, until May 29, 2006.

Either when Hiatt was first hired or within his first year of work, North authorized new furniture for Hiatt's office. North also authorized a new bookshelf for plaintiff's office. Hiatt's office telephone has a speaker phone feature. Some time after Hiatt began working at Commerce, plaintiff asked North for a new speaker phone, but he did not approve it. North testified that he does not remember plaintiff requesting a speaker phone.[11]

Out-Of-State Travel To Conferences

Commerce attorneys must obtain North's approval before they may travel to conferences. North has approved travel to in-state continuing legal education ("CLE") seminars for all of his subordinate attorneys. North approves Hiatt's annual trip to the conference of the National Association of State Workforce Attorneys because Hiatt earns CLE credit at the conference.[12] North only authorizes funds for attorneys to travel to out-of-state conferences that offer CLE credit.

Aaron Davis worked at Commerce as Kansas Boxing Commissioner. On or about March 2, 2007, Davis asked the Kansas Athletic Commission for permission for plaintiff to attend the annual

---

[10]     Hiatt testified that he negotiated for the window office because he previously worked in a windowless office, which he did not enjoy and swore he would never do again. Plaintiff is unable to negotiate her compensation package because she is a classified employee.

[11]     North testified that plaintiff would not have needed his approval for a speaker phone because Commerce has many in its inventory, and his approval is only required if a request requires Commerce to spend funds. Plaintiff testified, however, that her phone line was not compatible with speaker phones in Commerce's inventory.

[12]     Further, Commerce can use federal funds for that conference instead of funds from the Economic Development Incentive Fund ("EDIF") appropriation, and Commerce has more federal dollars than EDIF dollars. North has never authorized the EDIF funds to pay for any attorney's travel to an out-of-state conference.

conference of the Association of Boxing Commissioners ("ABC") in Miami, Florida, in July of 2007. Davis told North that the Athletic Commission had approved plaintiff's request to attend the ABC conference. North did not approve the request and he never requested information about whether plaintiff could obtain CLE credit at the ABC conference. North did not explain to Davis why plaintiff could not attend the conference. North approved Davis' travel expenses to attend the ABC conference because Davis was Boxing Commissioner for Kansas.[13] If North had approved Davis' request for plaintiff to attend the ABC conference, she would have applied for CLE credit pursuant to Kansas Supreme Court Rule 803(b). Plaintiff believes that the CLE Commission would have approved such a request because in her opinion, the conference program met the standards set forth in Kansas Supreme Court Rule 804. Defendants counter that the conference agenda included mostly social events or presentations without legal import, specific to boxing commissioners. See Ex. 9 to Plaintiff's Memorandum In Opposition To Defendants' Motion For Summary Judgment ("Plaintiff's Memorandum") (Doc. #40) at 1-3. North does not recall plaintiff asking for his approval to attend the boxing conference, but he would not have given approval because it was not a CLE opportunity and would not have been an appropriate use of state EDIF.[14]

Commerce Disciplinary Procedures

Secretary Fricke made it very clear that Commerce has zero tolerance for racial discrimination of any kind. Fricke was involved in employee grievances if an employee wanted to elevate a grievance to the Secretary level. Commerce handled grievance investigations on a case-by-case basis. Commerce

---

[13]     Davis was an unclassified employee and not an attorney.

[14]     Federal funds could not be used to pay for plaintiff's travel to an out-of-state boxing conference because the Kansas Athletic Commission is an entity created by state statute and is 100 per cent state funded.

had no written guidelines regarding when someone outside the department should investigate a grievance. Fricke testified that usually Jeff Montague, the Human Resources manager, would review a specific case and determine whether to obtain an outside investigator. Fricke Depo. at 72. Montague explained that "in general," the department uses outside investigators "because we want to preserve fairness, impartiality." Montague Depo. at 46.

Commerce generally subscribes to the notion of progressive discipline – from the lowest level, an oral warning or oral counseling, through a written reprimand, a suspension of one, three or five days up through termination. Letters of reprimand appear in the employee's official file. With respect to non-EEO complaints, a grievance starts with the employee verbally taking the concern to her supervisor and seeking resolution at that level. If the employee is not satisfied with the supervisor' verbal response, the employee can submit a written grievance to her supervisor's supervisor, who responds to the employee in writing. If the response is not satisfactory to the employee, she can submit her grievance in writing to someone at the appointing authority level, either the division director, the Deputy Secretary or the Secretary. That person responds to the employee grievance in writing. The employee has no internal-Commerce recourse if she is unhappy with the written response at the appointing authority level. Montague Depo. at 38-39.

A complaining employee does not have a right to a hearing; whether to hold a hearing is left to the discretion of the individual writing the response to the employee grievance. Id. at 39. Commerce has adopted a written policy establishing a grievance procedure, and the policy states in relevant part as follows:

> Whenever this grievance procedure provides for any grievance to be taken to the Secretary of Commerce, the Secretary may rule directly on the matter, or may appoint one or more persons as a hearing panel to gather information and make recommendations to the Secretary.

Ex. 10 to Plaintiff's Memo at 1.

<u>Letter of Reprimand dated December 19, 2006</u>

On December 8, 2006, plaintiff and Davis were standing in an open space in the Commerce office, approximately ten feet from the desk of Gina Hernandez, a secretary. Plaintiff began talking with Davis about an event scheduled on a Native American reservation. They discussed what (if any) taxes the tribe would pay the State. After some lively conversation, plaintiff told Davis that she "did not trust Indians to pay the tax." Befort Depo. at 209, 214, 220. Plaintiff described the conversation as follows:

> My conversation with Boxing Commissioner Aaron Davis on the morning of December 8, 2006, involved a proposed boxing event scheduled at the Harrah's Prairie Band Casino on January 4, 2007. During the course of this conversation, I suggested to Mr. Davis that he make sure the Department of Commerce secures the tax owed the KDOC in the statutory amount of five percent (5%) of the receipts from the ticket sales to the event. In order to ensure that KDOC collected the five percent tax, the Boxing Commission should get the money immediately upon the date of the event or the KDOC may risk not getting it at all. I kept questioning Mr. Davis as to who would pay the tax to the Commission. Mr. Davis kept telling me that the tribe agreed to pay the tax. I repeatedly tried to point out to Mr. Davis that the State has no authority to collect a tax on an Indian Reservation and the Indian tribe is under no obligation to pay the state any tax. Mr. Davis kept telling me that the Indians would pay the tax. I finally told him that I don't trust the Indians to pay the tax.

Ex. G to Defendants' Memo at 16. Hernandez heard plaintiff's statement. Plaintiff knew that the father of Hernandez' son is Native American and that Hernandez' child is part Native American. Thus, plaintiff believed that she should apologize to Hernandez.[15] Plaintiff's apology angered Hernandez. Plaintiff knew that Hernandez was very upset because "she was hollering at me and very belligerent," Befort Depo. at 264–265. Hernandez did not accept plaintiff's apology.

---

[15] Plaintiff stated that she apologized to Hernandez because she likes to keep harmonious relationships in the office and tries never to hurt anybody.

Plaintiff testified that "I was talking about a group in a certain context and a certain situation dealing with Indians. I didn't single out one Indian or whatever Indian." Id. at 216. Plaintiff testified that in context, she was specifically referring to a proposed boxing event scheduled at the Harrah's Band Casino, and that "how I said it, Indian, in the situation that I said it was not wrong." Id. at 17. Plaintiff agrees that if she had said that she doesn't trust blacks to pay their taxes, then her statement would have been inappropriate. Plaintiff does not believe her actual statement was inappropriate, however, because "[t]here is no showing anywhere that Indian was a bad word." Id. at 216-18. Plaintiff further explained, "how I said it, Indian, *in the situation that I said it* was not wrong." Id. at 217(emphasis added). Plaintiff insists that neither what she said about Native Americans, nor how she said it, was inappropriate because "[she] didn't trust the Indians to pay the tax." Id. at 215. Plaintiff further explained:

> It's [the word Indian] not a racial slur and I don't trust them to pay the tax because when we look down the list and you find out what the ultimate outcome was, they weren't about to pay any tax monies to the State of Kansas or to the Department of Commerce Boxing Commission.

Id. at 214. Plaintiff also insists that when she said that she didn't trust Indians, what she meant was that she didn't trust the particular Indian tribe that she and Davis were discussing. Plaintiff states that she might have initially used more appropriate terminology to express her point regarding the State's jurisdiction on Indian reservations, but that she ultimately said "I don't trust Indians to pay the tax" because she "was trying to get [her] point across to [Davis] and he wasn't listening to [her]." Id. at 224-25. Plaintiff testified:

> Q. . . . You don't think it would have been more appropriate for you to simply have said, Mr. Davis, I don't think that the State of Kansas has the authority to collect the tax on the Indian reservation as opposed to saying, I don't trust the Indians to pay the tax?
>
> A. You know, I probably did say that to him that day, and I probably was trying to get

12

my point across to him and he wasn't listening to me.

Id. Plaintiff admits that she "was probably stupid for standing out there in the hallway. . . . Because those people took it out of context, that's why. . . . And they used anything they had against me." Id. at 228.

Shortly after plaintiff apologized, Hernandez stopped North as he was leaving a director's meeting and relayed her version of the incident to him. Hernandez alleged that plaintiff had made an inappropriate racial or ethnic comment. North returned to his office, where plaintiff and Beth Weishaar (North's secretary) approached him. North spoke individually with plaintiff and Weishaar about the incident.

Before she spoke with North, plaintiff had sent him an email to explain the incident. Plaintiff wrote that she had told Davis: "I don't trust the Indians when it comes to paying taxes to the state."[16]

_____

[16]     The e-mail stated as follows:

Aaron was telling me that he talked to a gentleman about an event at Harrah's on January 4th. Aaron told me that the Commission would be furnishing all the judges, referees etc for the event. Aaron said that this gentleman/promoter would be getting the permits from us. I said will we receive the 5% tax on the event. Aaron kind-a-sort-of indicated that he thought so. I said are you sure, we need to know this otherwise we are using our resources and not getting anything out of this. I said I don't trust the Indians when it comes to paying taxes to the state. Gina [Hernandez], looks up from her desk and said that she heard me and took offence [sic] with what I said.

. . .

Gina took my comment out of context. My concerns about payment of tax monies to the state by Indian tribes is not unfounded. Previously at KDHR, I dealt with Indians [sic] tribes on numerous legal issues including contribution tax matters. I have specifically dealt with the [Sac and Fox] tribe on the issue of payment of contribution taxes. Also, as you are well aware of my husband Jay has been in litigation for the past six years with several tribes. Dept. of Revenue is expecting a decision shortly from the 10th Circuit shortly on tax issues regarding [the] tribes and

(continued...)

She also wrote that her opinion as to the payment of taxes to the state by Indian tribes was based on her experience with payment of taxes by the Sac and Fox tribe, her husband's experience with other tribes and Department of Revenue issues regarding non-payment of taxes by tribes. She also stated that "[t]here are sound reasons from a legal point of view to be skeptical of any dealings with Indian tribes." Exhibit I to Defendants' Memo (Doc. #38) at 2.

Later that day, North met again with plaintiff. North testified that plaintiff threatened to take legal action against him if the investigation went beyond his office or if he involved human resources. Plaintiff characterized her statements to North as a "promise," not a threat, and testified that she told North as follows:

> I told him that this was way far out of hand how they were all acting about it, and I said I understand what my legal rights are and I made a promise. I promised that if he did something I would take the appropriate legal action and I understand very much what the appropriate legal action would be.

Befort Depo. at 266.

Over the next few days, North spoke with additional individuals about the incident. North had engaged non-Commerce investigators to look into past allegations against plaintiff. With respect to the incident on December 8, 2006, however, North testified that he felt that he could fairly and impartially

---

[16](...continued)
have been to the US Supreme Court on the issue of non payment of taxes by Indian tribes to the state of Kansas.

There are sound reasons from a legal point of view to be skeptical of any dealings with Indian tribes. Gina took my remark out of context and wanted to. I have been respectful of Gina and did understand her concern about my remark. However, Gina's attitude towards me was uncalled for. This is a professional office and I have the right to discuss legal matters with other staff members. Gina needs to understand this.

Exhibit I to Defendants' Memo (Doc. #38) at 2.

investigate because he was not a witness or participant in the event. In deciding not to use outside investigators, North did not consult with Montague. This was contrary to Commerce's usual or customary practice. Approximately one year earlier, North had been involved in settling the charges that plaintiff had raised against Commerce. North did not feel that he was biased against plaintiff or had a retaliatory motive because of his involvement in settling plaintiff's prior charges.[17]

After his investigation, North wrote a two-page "Summary of Investigation" which concluded that plaintiff had made a statement that she did not trust that Indians will pay their taxes, that Hernandez heard the statement and was offended by it and that plaintiff had attempted to apologize to Hernandez. See Ex. J. to Defendants' Memo (Doc. #38) at 2. The summary also described plaintiff's reaction to the investigation, as follows:

> In the course of my explaining to Merrill why the investigative process was important and a natural function of our role as attorneys, Merrill indicated she was somehow held to a different standard because she was a woman. Merrill had also put in the earlier e-mail that "I do get treated differently by the clerical staff in this office than do male members." Merrill also indicated that if the agency took any action against her as a result of this comment that she would take action herself.

Id. North gave the summary to Montague so that Montague and Secretary Fricke could review it and determine what action, if any, to take. North did not give Montague a copy of plaintiff's explanatory email of December 8, 2006.

North testified that he does not remember recommending to Montague or Fricke any particular disciplinary action as a result of plaintiff's behavior and that as a general rule, he did not provide input on disciplinary actions meted out by Commerce.[18] Fricke testified that before deciding whether to take

---

[17] Plaintiff asserts that North's involvement in her prior administrative charges biased him and/or gave him a retaliatory motive.

[18] North testified that he did not make any recommendation to Fricke because he viewed
(continued...)

15

disciplinary action, his custom and practice would have been to consult North and Montague and seek their input and advice.[19]

On December 19, 2006, after reviewing the "Summary of Investigation," Fricke issued plaintiff a letter of reprimand.[20] <u>See</u> Ex. K to <u>Defendants' Memo</u> (Doc. #38). The letter stated that "[b]ased on the information gathered by Mr. North, it is apparent that you made a racial slur regarding Native Americans causing third party harassment for another employee." <u>Id.</u> at 1. The letter of reprimand also stated that plaintiff made "a veiled threat toward Mr. North by warning that if the agency took any action against you, you would take action yourself." <u>Id.</u> The letter also stated as follows:

> Please know that we have taken this situation very seriously. We had considered proposing your suspension; however, because you are an exempt employee, we are

---

[18](...continued)
his role as trying to develop the facts and report those facts to human resources and Fricke so that they could determine what action to take, if any.

[19]       North testified that for making a racial slur, Commerce could have taken disciplinary action against plaintiff ranging from verbal counseling to termination.

[20]       Plaintiff notes Montague's testimony that prior to drafting a letter of reprimand, his habit was to get information from the supervisor or manager. Fricke testified that before signing a letter of reprimand, his custom and practice would have been to review it with Montague and North and seek their input, advice and direction

With respect to the facts underlying the letter of reprimand dated December 19, North was the fact-gatherer and Fricke was not.

Fricke testified that depending on the context of the statement, the words "Indian" or "Native American" could be construed as a racial slur, particularly if someone was made to feel uncomfortable by the manner in which the words were used. Fricke Depo. at 76–77. The parties stipulated that Commerce does not prohibit the term "Indian" in an unoffensive context. Pretrial Order at 3, stipulation no. 8. Except for plaintiff, no employee at Commerce has been disciplined for using the term "Indian." Montague Depo. at 125. No one else at Commerce has made comments regarding Native American tribes that are similar to plaintiff's comments on December 8, 2006. When deciding whether Montague and North had conducted an unbiased and objective review of plaintiff's comment, Fricke relied on their expertise, objectivity and integrity. Fricke made no specific inquiry whether Montague and North were in fact unbiased and objective in regard to plaintiff's comment. <u>See</u> Fricke Depo. at 94-95.

> limited to suspensions in 5 day increments.  We determined that a letter of reprimand should be sufficient for you to amend your professional behavior and demonstrate greater professional judgment that is commensurate with your educational training in the future.  Be advised that any similar problems in the future may lead to additional disciplinary action up to and possibly including termination.

Id. at 2.

On December 27, 2006, plaintiff filed a grievance contesting the letter of reprimand.  She attached to the grievance a letter to Fricke which characterized the content and context of plaintiff's conversation with Davis.  As to the alleged "veiled threat toward North," the letter stated as follows:

> I did not make a veiled threat to Mr. North.  I did indicate to him that I hoped this matter did not get blown out of proportion but, if it did, I would take appropriate action.  That was never intended as a threat, veiled or otherwise.  As a victim of discriminatory treatment in the past, I am aware that one must protect one's own rights.  At no time was I insubordinate to Mr. North.

Exhibit L to Defendants' Memo (Doc. #38) at 3.

On December 29, 2006, Fricke sent a letter to plaintiff, denying her grievance relating to the letter of reprimand.  Fricke's letter of December 29 stated in part as follows:

> I am disappointed in your behavior during that incident.  Furthermore I am disappointed in your lack of professional behavior following the incident including your direction to Ms. Hernandez that she did not need to talk to Mr. North about the incident and your verbal, and now written, threats to Mr. North to take action if the agency was to proceed as the law dictates it should.

Exhibit M to Defendants' Memo (Doc. #38) at 2.

On January 10, 2007, plaintiff submitted a rebuttal letter to Fricke's letter of December 29.  She asserted as follows:

> I am filing this letter of rebuttal first to protest the denial of my due process rights.  Contrary to the assertion in the December 29, 2006 letter, Commerce Grievance Policy #: 01-011-03 applies.  The purpose of the Commerce grievance procedure is to provide due process so that a dissatisfied employee may grieve work related issues that adversely affect him/her. . . . The Letter of Reprimand determined I made a racial slur; I disagree and am dissatisfied with that conclusion which may adversely impact and affect my well

being as an employee. Despite the plain language of the above policy, I have been denied any recourse or redress by Commerce. The adverse action which is the subject of my grievance is not within the areas excepted. Contrary to the Department's Policy, I have not had the opportunity to challenge and grieve the above referenced Letter of Reprimand.

Ex. N to Defendants' Memo (Doc. #38) at 1.

Access to Letters of Reprimand and Personnel Files

The Department of Human Resources at Commerce maintains an employee's official personnel file. Montague testified that Kansas agencies and the Governor's office have access to the official files of state employees. Non-state employers do not have access to a state employee's official file unless the employee specifically releases the file to the non-state employer. In applying for a different position with the State of Kansas, plaintiff is not required to turn over a letter of reprimand, and she would not voluntarily provide a copy of the letter to future employers. Plaintiff testified, however, that if she were asked whether she had ever had any problems with her employer, she would be obligated to truthfully answer by disclosing the letter of reprimand. Plaintiff's letter of reprimand was never distributed to plaintiff's co-workers at Commerce or to anyone outside Commerce.

On July 14, 2009, plaintiff interviewed for a job with the Kansas Department of Labor. Before the interview, the Department of Labor had asked plaintiff to sign a release allowing access to her personnel file and she agreed. Plaintiff has interviewed for several other jobs during her tenure at Commerce and she has not provided her personnel file to the other entities with whom she has interviewed.

**Analysis**

Plaintiff alleges disparate treatment in violation of Title VII (Count I), retaliation in violation of Title VII (Count II) and retaliation in violation of the Fourteenth Amendment and 42 U.S.C. §1983

(Count III).  Defendants assert that they are entitled to summary judgment on each of plaintiff's claims.

## I.    Title VII Disparate Treatment Claims (Count I)

Plaintiff claims that defendants took five adverse employment actions against her and that her gender was a motivating factor for the adverse actions.  Plaintiff asserts that the adverse actions include (1) paying plaintiff less than a male employee with the same job duties; (2) issuing a letter of reprimand after plaintiff said that she did not trust the Indians to pay taxes; (3) denying plaintiff's request for a window office; (4) denying plaintiff a speaker phone and (5) denying plaintiff's request to travel to an out-of-state conference.  Defendants assert that they are entitled to summary judgment on each of the claims because none of the actions were adverse employment actions and even if they were, plaintiff cannot show that her gender was a motivating factor for them.

Under Title VII, it is an unlawful employment practice for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of her sex.  42 U.S.C. § 2000e-2(a)(1). The Court applies a disparate treatment analysis to claims alleging that an employer treats some people less favorably than others because of their  sex. See Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008).  To prevail on her disparate treatment claim under Title VII, plaintiff must show that the alleged discrimination was intentional.  See id.

In Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), a Title VII gender discrimination case, the United States Supreme Court found that when plaintiff challenges an employment decision that may have been the product of a mixture of legitimate and illegitimate motives, i.e. mixed motives, she need not squeeze her proof into the McDonnell Douglas burden-shifting framework.  490 U.S. at 246-47. Rather, the Supreme Court held that once plaintiff shows that an improper motive played a motivating

part in an employment decision, defendant may avoid liability if it proves that it would have made the same decision despite the improper motive.  Id. at 244-45.[21]   After Price Waterhouse, many courts required that plaintiffs present direct evidence of discrimination to proceed on a mixed-motive theory. See, e.g., Mohr v. Dustrol, Inc., 306 F.3d 636, 640-641 (8th Cir. 2002); Fernandes v. Costa Bros. Masonry, Inc., 199 F.3d 572, 580 (11th Cir. 1999); Trotter v. Bd. of Trs. of Univ. of Ala., 91 F.3d 1449, 1453-54 (11th Cir. 1996); Fuller v. Phipps, 67 F.3d 1137, 1142 (4th Cir. 1995).[22]   In Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003), however, the Supreme Court clarified that a plaintiff could proceed on mixed-motive theory with only circumstantial evidence.  Thus, a party asserting a discrimination claim under Title VII may proceed under a mixed motive theory, see Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1224-25 (10th Cir. 2008); or the familiar three-part McDonnell Douglas framework.  See Brantley v. Unified Sch. Dist. No. 500, No. 08-2059-EFM, 2009 WL 1804133, at *5 (D. Kan. June 24, 2009) (setting forth mixed motive framework).  Here, plaintiff proceeds only on a mixed motive theory, and therefore the Court does not analyze her claims under the McDonnell Douglas framework.[23] Medlock v. Ortho Biotech, Inc., 164 F.3d 545, 550 (10th Cir. 1999).[24]

---

[21]     The Civil Rights Act of 1991 overruled Price Waterhouse to the extent that decision held that an employer could avoid liability under Title VII by proving it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-2(m).  The amended statute merely restricts plaintiff's remedies – as opposed to absolving liability altogether – if defendant shows that it would have taken the same action absent the unlawful motive.  See 42 U.S.C. § 2000e-5(g)(2)(B).

[22]     The Tenth Circuit, however, stated that plaintiffs could proceed on a mixed-motive theory with direct or circumstantial evidence.  See, e.g.,Medlock v. Ortho Biotech, Inc.,164 F.3d 545, 550 (10th Cir. 1999).

[23]     Most of the 10th Circuit cases addressing a mixed-motive theory are in the context of alleged retaliation.  Discrimination, however, may be pursued under the mixed-method theory as well.  See Price Waterhouse, 490 U.S. 228.

[24]     Under a "mixed-motive" theory, plaintiff may directly show that discriminatory
(continued...)

To establish Title VII disparate treatment claim, plaintiff must show that (1) defendants took an adverse employment action against her and (2) her gender was a motivating factor for the adverse action. See White v. Baxter Healthcare Corp, 533 F.3d 381, 400 (6th Cir. 2008). In a mixed motive case, plaintiff must introduce direct or circumstantial evidence that the alleged discriminatory motive actually relates to the question of discrimination in the particular employment decision, not to existence of other, potentially unrelated, forms of discrimination in the workplace. Fye, 516 F.3d at 1225 (citing Thomas v. Nat'l Football League Players Ass'n, 131 F.3d 198, 204 (D.C. Cir. 1997)). Plaintiff must present evidence that directly shows that discrimination played a motivating part in the employment decision. Fye, 516 F.3d at 1226.

Direct evidence is evidence which if believed proves the existence of a fact in issue without inference or presumption. Riggs v. AirTran Airways, Inc., 497 F.3d 1108, 1117 (10th Cir. 2007) (citing Hall v. U.S. Dep't of Labor, 476 F.3d 847, 855 (10th Cir. 2007)). In a mixed-motive case, direct evidence of discrimination includes evidence of oral or written statements on the part of a defendant showing a discriminatory motivation. Cuenca v. Univ. of Kan., 101 Fed. Appx. 782, 788 (10th Cir. 2004) (citing Kendrick v. Penske Transp. Servs. Inc., 220 F.3d 1220, 1225 (10th Cir. 2000)). Direct evidence can also consist of circumstantial evidence. Desert Palace, 539 U.S. at 98-102. While circumstantial evidence is sufficient to demonstrate that the employer was motivated by discriminatory animus, it must relate directly to the discriminatory motive. Fye, 516 F.3d at 1226 (citing Thomas v.

---

[24](...continued)
animus played a "motivating part" in the employment decision. Fye, 516 F.3d at 1225 (citing Price Waterhouse, 490 U.S. at 250). Once the plaintiff proves that discriminatory animus was a motivating factor, the burden of persuasion shifts to defendant to prove that it would have taken the same action absent the discriminatory motive. Fye, 517 F.3d at 1225. In the alternative, if plaintiff cannot directly establish that discrimination played a motivating part in the employment decision, plaintiff may rely on the familiar burden shifting to prove that the employer's proffered reason for its decision is a pretext for discrimination. Fye, 516 F.3d at 1225.

Denny's, Inc., 111 F.3d 1506, 1512 (10th Cir. 1997)).

The Court addresses in turn each of plaintiff's five claims of adverse employment actions.  As noted, defendants assert that as to each of these claims, plaintiff has not produced evidence of an adverse employment action or evidence that gender discrimination was a motivating factor for the adverse employment action.

A.     Unequal Pay

Plaintiff contends that – viewing the facts in the light most favorable to her – a reasonable jury could conclude that because of her gender, defendants paid her less than a male attorney (Hiatt) who performed the same job duties.  Plaintiff asserts that creating an unclassified Attorney III position, and then hiring Hiatt to fill it at a salary higher than hers, constituted an adverse employment action.  Defendants assert that the creation of the unclassified Attorney III position with a higher salary is not an adverse employment action.  They point out that while the unclassified position paid a higher salary, it does not include the significant job protections to which a classified position is entitled.  Thus, defendants argue that even if plaintiff's position and Hiatt's position perform the same job duties, Hiatt's unclassified position justifies a higher salary because of the at-will nature of his job.

Plaintiff counters that a reasonable jury could determine that Commerce's explanation for hiring Hiatt at a higher salary was false: that the lower job security of the unclassified position did not justify a higher salary.  In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).  In drawing such an inference, the factfinder must be able to conclude, based on a preponderance of the evidence, that discrimination was a determinative factor in the employer's actions – simply disbelieving the employer is insufficient.

Applying this principle requires the Court to determine whether discrimination played a part in the employer's actions. Young v. Dillon Co.'s Inc., 468 F.3d 1243, 1250 (10th Cir. 2006).

Defendants point out that creating the unclassified position and hiring Hiatt at a salary higher than plaintiff's did not change plaintiff's employment status in any way. They also point to case law (from other jurisdictions) that as a matter of law, classified and unclassified employees are not similarly situated. See Wallace v. Med. Ctr. of La., No. 01-579, 2009 WL 910663, at *5 (E.D. La. April 2, 2009) (classified salary determined by classified salary system, not by race); Russell v. Drabik, No. 00-4117, 2001 WL 1556996, at *4 (6th Cir. Dec. 4, 2001) (classified and unclassified employees not similarly situated). The Court agrees that ordinarily, hiring someone to fill a new unclassified position at a higher salary than a classified employee performing the same duties would not constitute an adverse employment action. Here, however, on January 10, 2006, plaintiff and Commerce had entered a settlement agreement to resolve plaintiff's administrative charge of salary discrimination based on sex. The agreement provided that Commerce would retroactively increase plaintiff's compensation to that of the other Attorney III position within Commerce. A jury could conclude that Commerce gave a false explanation for creating an unclassified Attorney III position and hiring Hiatt to fill that position at a higher salary than plaintiff. Specifically, a jury could find that Commerce justified the position on the ground it would function as Deputy Chief Counsel for the agency but never had Hiatt function as Deputy Chief Counsel.

Here, in light of all of the circumstances, a jury could find that filling the Attorney III position with a higher-paid unclassified employee was an adverse employment action as to plaintiff. Based on a preponderance of the evidence, a jury could find that discrimination was a determinative factor in creating and filling the unclassified filling the other Attorney III position. See Lawson v. Potter, 463

F. Supp. 2d 1270, 1282 (D. Kan. 2006) (disparate treatment in regard to compensation a primary type of adverse employment action which Title VII was intended to remedy).

B.     Letter of Reprimand

Plaintiff asserts that the letter of reprimand on December 19, 2006 was an adverse employment action motivated by gender.  The letter of reprimand specifically states as follows: "be advised that any similar problems in the future may lead to additional disciplinary action up to and possibly including termination."  Plaintiff argues that the letter affected the likelihood that she would be terminated, or at least undermined her current position.  See Medina v. Income Support Div., New Mex., 413 F.3d 1131, 1137 (10th Cir. 2005) (employment action adverse if it affects likelihood that plaintiff will be terminated, undermines plaintiff's current position, or affects future employment opportunities). Defendants counter that the letter of reprimand did not effect a significant change in plaintiff's employment status.  They point out that Commerce did not fire or suspend plaintiff, give her a negative performance evaluation or change her job duties.   Further, the letter of reprimand is kept in a confidential personnel file which is not accessible to the public.  Defendants assert that the only way the letter of reprimand could affect plaintiff's future employment opportunities would be for plaintiff to disclose it to a potential employer.  As plaintiff points out, however, if a potential employer asks if she has ever received a reprimand, she would have to answer yes.  A jury could find that the letter constitutes an adverse employment action.  Cf. Hall v. Interstate Brands Corp., No. 08-2073, 2009 WL 2043570, at *4 (D. Kan., July 13, 2009) (four verbal or written reprimands not adverse employment actions because plaintiff made no showing that the reprimand had an impact on the plaintiff's employment and employer took no action beyond reprimands themselves).

Assuming the letter of reprimand was an adverse employment action, defendants argue that the

Court should grant summary judgment because plaintiff can produce no evidence that her gender played any role in the decision to issue it. Plaintiff argues that Commerce gave a false explanation for issuing the letter because she did not make a racial slur regarding Native Americans. As noted, in appropriate circumstances, the trier of fact can reasonably infer from the falsity of an explanation that the employer is dissembling to cover up a discriminatory purpose. In drawing this inference, the factfinder must be able to conclude – based on a preponderance of the evidence – that discrimination was a determinative factor in the employer's actions; simply disbelieving the employer is insufficient. Applying this principle to a mixed-motive case, the Court must determine whether the record supports a finding that discrimination played a part in the employer's actions. Brantley, 2009 WL 1804133, at *7. Here, plaintiff argues that in context, her statement that "I don't trust Indians to pay the tax" was not inappropriate. The Court agrees that viewed in a light most favorable to plaintiff, the letter of reprimand was unwarranted. Plaintiff has submitted evidence from which a reasonable juror could conclude that Secretary Fricke's decision to issue the letter of reprimand was motivated by plaintiff's gender.

C.     Denial of Request for Window Office

Plaintiff argues that a reasonable jury could find that North's decision to deny her request for the window office was an adverse employment action. Defendants point out that plaintiff remained in the same office she had occupied since transferring to Commerce in 2004, and assert that it was not an adverse employment action. Although neither side cites specific case law on this point, courts have found that denial of a window office is not even materially adverse for purposes of a retaliation claim, which is a lower standard than for a disparate treatment claim. See Gilbert v. Des Moines Area Cmty. Coll., 495 F.3d 906, 918 (8th Cir. 2007) (moving employee from office with window to office without window not materially adverse); Spector v. Bd. of Trs. of Cmty-Tech. Colls., No. 3:06-cv-129 (JCH),

2007 WL 4800726, at *8 (D. Conn. Dec. 27, 2007) (move from office with window to office without window not materially adverse), aff'd, 316 Fed. Appx. 18 (2d Cir. 2009). The Court finds that defendants' motion for summary judgment should be granted as to this claim.

D.     Refusing to Approve New Speaker Phone

Plaintiff argues that a reasonable jury could find that North's decision not to approve a speaker phone was adverse employment action based on her gender. As defendants argue, failure to provide a speaker phone was not an adverse employment action. See Gross v. Nat'l Broad. Co., 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) (denial of choice of equipment may be inconvenience but not adverse employment action). Defendants are entitled to summary judgment on this claim.

E.     Failure to Approve Travel To Out-of-State Conference

Defendants assert that they are entitled to summary judgment on plaintiff's claim that Commerce discriminated on the basis of sex when North denied her request to attend the out-of-state boxing conference because it is not an adverse employment action. Although neither side cites specific case law on this point, courts have found that denial of a single training or travel opportunity is not an adverse employment action. Edwards v. EPA, 456 F. Supp.2d 72, 85 (D. D.C. 2006) (greater weight of authority suggests that denial of single training or travel opportunity does not constitute adverse employment action unless plaintiff ties it to actual tangible adverse employment consequence). Defendants are entitled to summary judgment on this claim.

## II.     Title VII Retaliation Claims

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because she has opposed any practice made an unlawful employment practice by Title VII, or because she has made a charge, testified, assisted or participated in any manner in an investigation,

proceeding or hearing under Title VII. 42 U.S.C. § 2000e-3(a). To prevail on a Title VII retaliation claim, plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden under a mixed-motive or pretext theory. See Fye, 516 F.3d at 1224-25. Plaintiff again relies upon a mixed-motive theory, which requires her to show that retaliatory animus played a motivating part in the employment decision. Id. at 1225.

Plaintiff claims that on December 8, 2006, she complained to North that she was being discriminated against because of her gender. She asserts that defendants took five adverse employment actions in retaliation for her protest of gender discrimination: (1) defendants paid her less than Hiatt; (2) defendants denied her request for the window office; (3) defendants did not provide her a speaker phone; (4) defendants issued her a letter of reprimand after she said that she did not trust the Indians to pay taxes; and (5) defendants denied her request to travel to an out-of-state conference. Defendants assert that they are entitled to summary judgment on each of these actions because none of them were materially adverse employment actions and that even if they were, plaintiff cannot show that her gender was a motivating factor.

As noted, plaintiff argues her retaliation claim under a mixed-motive framework. Under the mixed-motive theory, plaintiff must show that retaliatory animus played a motivating part in the employment action. Fye, 516 F.3d at 1225. If she can do so, the burden of persuasion shifts to the employer to prove that it would have taken the same action absent the retaliatory motive. Id.

Title VII protects individuals from retaliation that produces an injury or harm. Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 67 (2006). For purposes of a Title VII retaliation claim, a materially adverse action is one which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68. In determining material adversity, "the significance

of any given act of retaliation will often depend upon the particular circumstances." Id. at 69.

Plaintiff correctly asserts that although her retaliation claim asserts the same five adverse actions which form the basis of her disparate treatment claim, a different and less strict standard applies for determining whether these employment actions are "adverse." Under this less strict standard, plaintiff must show that a reasonable employee would have found the challenged action materially adverse, i.e., that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Burlington, 584 U.S. at 68; see also Somoza v. Univ. of Denver, 513 F.3d 1206, 1212-13 (10th Cir. 2008). Plaintiff globally argues that for the same reasons the actions were "adverse" in the context of her disparate treatment claim, all five were "adverse" in the context of her retaliation claim, which utilizes a less strict standard. The Court addresses each action in turn.

A.    Unequal Pay

Plaintiff claims that Commerce retaliated against her by hiring Hiatt as an unclassified attorney at a higher rate of pay than she earned. The Court has already found that plaintiff has set out an adverse employment action. Therefore she has also met the lower standard for an adverse action for purposes of a retaliation claim.

Defendants assert that even if the Court determines that defendants' decision to hire Hiatt at a higher rate of pay is materially adverse, plaintiff can produce no direct evidence that retaliation played a motivating part in the decision to hire an unclassified attorney at a higher salary than plaintiff. Defendants assert that prior to plaintiff's informal complaint on December 8, 2006, plaintiff had not complained about discrimination since August 19, 2005, when she filed an administrative charge against Commerce. Defendants point out that the Tenth Circuit has held that even four months is too large a time gap to establish a causal connection between a plaintiff's protected activity and an employer's

retaliatory act.  Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007).  Defendants argue that here, the time gap greatly exceeds four months.  In January of 2006, however, Commerce entered a settlement agreement of plaintiff's 2005 complaint of gender discrimination.  Defendants' decision to hire another attorney at a higher rate a few months after the settlement agreement provides some evidence from which a jury could find that retaliation played a motivating part in the decision.  The Court finds that defendants are not entitled to summary judgment on this claim.

B.    Letter of Reprimand dated December 19, 2006

Plaintiff claims that Commerce retaliated by issuing the letter of reprimand dated December 19, 2006 in retaliation for her complaint to North on December 8, 2006 that the investigation was being conducted because of her sex.  Defendants assert that a reasonable person would not be dissuaded from making or supporting a charge of discrimination if she knew that she would receive a letter of reprimand for making a racially insensitive remark.  Defendants suggest that any reasonable person would expect a letter of reprimand if she made a racially insensitive remark at work, and that the letter is therefore not a materially adverse action.  As the Court found above, however, the evidence supports a finding that plaintiff's remark was not a racial slur and that the letter was not appropriate.  A reasonable person could be dissuaded from making or supporting a charge of discrimination if she knew she would receive an *unwarranted* letter of reprimand.  Further, defendants issued the letter within a short time of plaintiff's protected activity on December 8, 2006.

The Tenth Circuit has recognized that protected conduct closely followed by adverse action may justify an inference of retaliatory motive.  Marx v. Schnuck Mkts., Inc., 76 F.3d 324, 329 (10th Cir. 1996); see also Annett v. Univ. of Kan., 371 F.3d 1233, 1240 (10th Cir. 2004); Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (two months and one week sufficient to support

29

prima facie case of retaliation). Here, on December 8, 2006, plaintiff complained to North that she was being discriminated against. Eleven days later, Commerce issued the letter of reprimand. Defendants argue that because plaintiff made her discrimination complaint *after* North had started investigating her statement regarding Native Americans, the discrimination complaint cannot justify an inference of retaliatory motive. Defendants argue that if temporal proximity were sufficient, every plaintiff could survive summary judgment by alleging discrimination as soon as she suspects an investigation into her behavior. See Brantley, 2009 WL 1804133, at *10 (while close temporal proximity may justify inference of retaliatory motive, it is generally insufficient to defeat summary judgment). Here, however, plaintiff has presented evidence that the letter of reprimand may have been undeserved. In light of all the circumstances, a reasonable jury could find that retaliation at least played a part in the decision to issue the letter of reprimand dated December 19, 2006. See Medlock, 164 F.3d at 550. The Court finds that defendants are not entitled to summary judgment on this claim.

C.      Denial of Window Office

Plaintiff claims that Commerce retaliated against her by denying her request for the window office. Defendants assert that this is not a materially adverse employment action, and the Court agrees. See Gilbert, 495 F.3d at 918 (moving employee from office with window to office without window not materially adverse). Defendants are entitled to summary judgment on this claim.

D.      Denial of Request For Speaker Phone

Plaintiff argues that a reasonable jury could find that North's decision not to approve the purchase of a new speaker phone was an adverse employment action based on her gender. As defendants argue, failure to provide a speaker phone would not dissuade a reasonable worker from making or supporting a charge of discrimination. See Roberts v. Paulson, No. 1:07 cv 173 CW, 2008

WL 4926728, at *4 (D. Utah Nov. 14, 2008) (denying computer access not materially adverse). Defendants are entitled to summary judgment on this claim.

E.    Failure to Approve Travel To Out-of-State Conference

Finally, defendants assert that they are entitled to summary judgment on plaintiff's claim that Commerce retaliated against her by denying the request to travel to an out-of-state boxing conference because it is not a materially adverse employment action. The Court agrees. Plaintiff does not contend that denial of her request to attend the conference resulted in diminution of her salary or future career prospects. See Baker v. City of Toledo, Ohio, No. 3:05 CV 7315, 2007 WL 1101254, at *8 (N.D. Ohio, April 11, 2007) (denial of training not materially adverse because plaintiff did not show how she was harmed or how reasonable employee would have been discouraged from bringing discrimination claim); cf. Higgins v. Gonzales, 481 F.3d 578, 590-91 (8th Cir. 2007) (failure to provide training may be materially adverse if impacts salary or employment prospects). Defendants are entitled to summary judgment on this claim.

## III.   Deprivation of Liberty Interest Without Due Process (Count III)

Plaintiff claims that defendants violated her liberty interest in her good name and reputation. Specifically, plaintiff claims that the letter of reprimand contained statements which deprived her of a liberty interest in her good name and reputation without due process of law.

In Workman v. Jordan, 32 F.3d 475, 481 (10th Cir. 1994), the Tenth Circuit set out a four-part test for whether statements infringe upon a liberty interest: the statements must (1) impugn the good name, reputation, honor or integrity of the employee; (2) be false; (3) occur in the course of terminating the employee or foreclose other employment opportunities and (4) be published. For purposes of summary judgment, defendants concede that plaintiff can establish the first two elements but argue that

she can not satisfy the third and fourth prongs.

Defendants assert that after Workman, the Tenth Circuit modified the third prong to require that the defamatory statements be made in the course of terminating the employee *and* foreclose other employment opportunities, as follows:

> Under the test formulated in Workman, 32 F.3d at 481, the defamatory statements "must occur in the course of terminating the employee *or must foreclose other employment opportunities*" (emphasis added). At first blush, it appears that this prong of the test can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities. Workman, which was decided on other grounds, did not examine this question. In delineating this prong of the test, Workman cited Paul [v. Davis], 424 U.S. at 710, 96 S.Ct. 1155, and Sullivan v. Stark, 808 F.2d 737, 739 (10th Cir. 1987) . . . . Paul clearly requires that the defamation occur in the course of the termination of employment. Sullivan did not abrogate or minimize this requirement. While the language of Workman may be susceptible to another reading, we conclude that the Workman court did not intend to create a test under which a liberty interest might be infringed by any defamatory statement that might foreclose future employment opportunities.

Renaud v. Wyo. Dep't of Family Servs., 203 F.3d 723, 728, n.1 (10th Cir. 2000); see Valdez v. New Mex., 109 Fed. Appx. 257, 262 (10th Cir. 2004) (adopting Renaud's modification of Workman four-part test); Lassiter v. Topeka Unified Sch. Dist. No. 501, 347 F. Supp. 2d 1033, 1046, n. 9 (D. Kan. 2004) (noting that with respect to third part of Workman test, subsequent Tenth Circuit authority suggests that correct terminology is "and"). Renaud specifically held that defamation, standing alone, is not sufficient to establish a claim for deprivation of a liberty interest; the defamation has to occur in the course of the termination of employment. 203 F.3d at 726-27 (citing Paul v. Davis, 424 U.S. 693, 710 (1976)).

Plaintiff does not respond to defendants' assertion that she must show both that the statements occurred in the course of termination *and* foreclosed other employment opportunities. See Plaintiff's Response Brief (Doc. #39) at 33-34. Rather, she quotes this Court's opinion in Bell v. Bd. of County Comm'rs, 343 F. Supp.2d 1016, 1020 (D. Kan. 2004), which in turn quoted the four elements set out

in Workman.[25]  She then states that "[a]s to the third element of her liberty interest claim, [plaintiff] contends that the stigmatizing statements in the December 19 Letter of Reprimand 'foreclosed other employment opportunities.'"  Doc. #39 at 34.  She asserts that a reasonable jury could find that the statements in the letter of reprimand foreclosed other employment opportunities, based upon her unsuccessful interview with the Kansas Department of Labor on July 14, 2009.

It is not entirely clear whether Renaud holds that the third prong of Workman requires that the defamatory statements be made in the course of terminating the plaintiff *and* must foreclose other employment opportunities.  For example, in Darr v. Town of Telluride, Colorado, 495 F.3d 1243 (10th Cir. 2007), the Tenth Circuit quoted the third prong from Workman and stated that in Renaud, it had "suggested" that Workman's third element should have required that the statement must occur in the course of terminating the employee *and* must foreclose other employment opportunities.  The Tenth Circuit then declined to further address the issue because plaintiff could not show that defendant had acted under color of law.  Darr, 495 F.3d at 1255; see also Lassiter, 347 F.Supp.2d at 1046 n. 9 (citing Renaud but declining to delve into thorny issue whether and or or is proper terminology); Jackson v. Kan. County Ass'n Multiline Pool, No. 03-4181-JAR, 2006 WL 963838, at *11 (D. Kan. Apr. 10, 2006) (same).

Defendants argue that the Court need not decide whether Renaud changed the third prong

───────────────────

[25]     In Bell v. Bd. of County Comm'rs, this Court initially overruled defendant's motion for summary judgment on the plaintiff's liberty interest claim, finding that plaintiff had raised a question of fact whether defendant had made a stigmatizing statement in the course of termination. See 2004 WL 624972, at *17 (D. Kan. March 29, 2004).  The Court did not specifically address whether plaintiff had shown foreclosure of other employment opportunities. See id.  After the jury found for plaintiff on the liberty interest claim, the Court sustained defendant's motion for judgment as a matter of law, finding that plaintiff had not produced evidence of publication. 343 F. Supp.2d at 1023.

because plaintiff was not terminated and cannot show that the statement foreclosed prospective employment opportunities. Plaintiff counters that based on her unsuccessful interview with the Department of Labor on July 14, 2009, a reasonable jury could find that the stigmatizing statements foreclosed other job opportunities. Plaintiff does not assert that the Department of Labor asked whether she had ever received a letter of reprimand, that plaintiff told them about the letter or that the Department of Labor actually accessed her file. The record contains no evidence that the stigmatizing statements foreclosed any employment opportunity. Defendants are therefore entitled to summary judgment on her liberty interest claim.

In the alternative, defendants assert that plaintiff cannot establish the fourth element of her liberty interest claim – publication. See Graham v. City of Okla. City, 859 F.2d 142, 145 n.2 (10th Cir. 1988). Commerce placed the letter of reprimand in plaintiff's official personnel file; non-state employers do not have access to a state employee's official personnel file unless the employee specifically releases the file to the non-state employer. Plaintiff points out that before her interview with the Department of Labor, she complied with their request to sign a release for access to her personnel file. As noted, however, the record contains no evidence that the Department of Labor accessed her file. Furthermore, intra-government dissemination, by itself, falls short of the Supreme Court's notion of publication: "to be made public." Asbill v. Hous. Auth. of Choctaw Nation, 726 F.2d 1499, 1503 (10th Cir. 1984) (quoting Bishop v. Wood, 426 U.S. 341, 348 (1976)); Lollis v. City of Eufaula, 2006 WL1705258, at *6 (E.D. Okla. 2006) (publication requirement not met where contents of police officer's reprimand not disseminated outside police department or city council), aff'd, 249 Fed. Appx 20 (10th Cir. 2007); Wilson v. Reno County, Kan., No. 88-1641-T, 1990 WL 260533, at *7 (D. Kan. 1990) (publication requirement not met where damaging statements were only disclosed to other

government officials).

Plaintiff points out that if a job interviewer asked her whether she had problems with her employer, she would be obligated to disclose the letter of reprimand. Plaintiff asserts that this constitutes evidence of imminent publication, which is enough to meet the fourth prong. See Bell, 343 F. Supp. 2d at 1021-1023 (if plaintiff alleged and produced evidence of imminent publication, he might be entitled to injunctive relief, including name-clearing hearing and order prohibiting dissemination) (citing Koerpel v. Heckler, 797 F.2d 858 (10th Cir. 1986)). The letter, however, merely memorializes the problem which she had, independent of the letter. Furthermore, as defendants point out, plaintiff testified that she would not voluntarily provide a copy of the letter to prospective employers. Moreover, she has interviewed for several jobs since receiving the letter of reprimand and has never provided her personnel file to non-state entities with whom she has interviewed. Plaintiff does not point to any authority for the proposition that the possibility that she will voluntarily disclose the stigmatizing statement herself constitutes imminent publication. The Court therefore finds that defendants are entitled to summary judgment on this claim.

**IT IS THEREFORE ORDERED** that Defendants' Motion For Summary Judgment (Doc. #37) filed August 7, 2009 be and hereby is **sustained in part**.

**IT IS FURTHER ORDERED** that defendants are entitled to judgment on plaintiff's Title VII disparate treatment and retaliation claims based on defendants' decision to deny plaintiff's request (1) for a window office; (2) for a speaker phone and (3) for travel to an out-of-state conference.

**IT IS FURTHER ORDERED** that defendants are entitled to judgment on plaintiff's claim under 42 U.S.C. § 1983 that defendants deprived her of a liberty interest in violation of the Fourteenth Amendment.

35

**IT IS FURTHER ORDERED** that plaintiff's Title VII disparate treatment and retaliation claims based on defendants' decision to (1) hire an unclassified male employee with the same job duties at a higher salary and (2) issue her a letter of reprimand **remain in the case**.

Dated this 17th day of December, 2009 in Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge